2000 SD 74

**In the Matter of Arlene REETZ,
Employee and Appellee,**

v.

**LUTHERAN HEALTH SYSTEMS,
Employer and Appellant.**

No. 21099.

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 2000.

Decided June 7, 2000.

Lynn A. Moran, Custer, for employee and appellee.

Donald A. Porter, and Patricia A. Meyers of Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter, Rapid City, for employer and appellant.

Drew C. Johnson, Aberdeen, for Department of Labor.

AMUNDSON, Justice

[¶ 1.] Lutheran Health Systems appeals a circuit court order affirming a decision by the South Dakota Department of Labor awarding Arlene Reetz unemployment insurance benefits. We reverse.

### FACTS

[¶ 2.] Reetz is a registered nurse and was a long time employee of Colonial Manor Nursing Home in Custer. Colonial Manor is affiliated with Lutheran Health Systems and the Black Hills Healthcare Network. By all accounts Reetz was a good and valued employee, having worked for Colonial Manor for approximately twenty-five years. Although she held various positions with the home over the years, Reetz was serving as a Medicare care plan coordinator at the time she left her employment.

[¶ 3.] On March 15, 1998, Reetz met with Nursing Service Administrator Jean Witt. Witt advised Reetz that, because of some company restructuring, her job would be eliminated as of April 1. Witt also gave Reetz job applications for several comparable positions that would be available at the home and told Reetz she could apply for them. Reetz did complete one application, however, before turning it in, she discovered a print copy of some e-mail correspondence among some papers she picked up in the office.[1] The e-mail was between the home's administrator and its human resource officer and was apparently written with reference to a letter the administrator intended to issue to employees whose jobs were about to be eliminated, including Reetz.[2] The administrator's e-mail inquiry stated:

Hi,

This is a sample of the letter to Arlie [Reetz], Denise and Kathy A. What needs to be revised.

I am in Rapid all day, so will look at it tonite [sic.] Have a good one.

The human resource officer responded:

From: Kathy Evans

To: DHOLM

Date: 3/17/98 8:11am

Subject: Suck-up letter –Reply

I don't know if I would keep the last sentence in it. How important is it really? Will she take that as a guarantee of a position? Can she use this against you should she not be chosen for a position and want to go to grievance? If she did get a postion [sic.], would she take this statement to heart (head) too much and feel that you can't run the place without her?

Just asking!!

---

1. There is no allegation of any impropriety by Reetz in her discovery of the e-mail.

2. The letter itself is not in the settled record.

Have you ever mentioned to Roger the question of severance for her or anyone else?

Has Jean Fish given an answer of acceptance of her new position? I would ask them to accept in writing as a matter of record for their file so we have a full understanding by everyone.

I just want to help you cover your butt so that we know that everything is kosher over there and never give them that loop hole.

See ya.

[¶ 4.] Reetz was seriously offended by the tenor of the e-mail and believed it indicated an intention by her superiors not to hire her for the positions she was told were available. When asked during the administrative hearing about the reasons for leaving her employment, Reetz testified:

I did find this letter that was, ah, a very damaging letter I thought, and it was insulting. It was, I called it the suck up letter, hum, anyway, it's, hum, presented in our information. I think it was document no. 6, and, hum, I just didn't feel that, I just didn't feel that this was proper.

At a later point in the hearing, when asked why she didn't apply for any available jobs, Reetz answered: "Well, because I found that suck-up letter and I just, hum, did not feel I, I just didn't feel that I could do it. I thought that letter that they were trying to get rid of me, and that they had no intentions of offering me a job."

[¶ 5.] After her discovery of the e-mail, Reetz decided not to apply for any of the positions available at the home. On March 19 she wrote a letter to the administrator charging that the elimination of her position was an attempt to get rid of her because of her seniority and higher pay. Noting that the home's rules entitled her to thirty days notice of termination and that she had not been provided with that notice, Reetz finished her letter by requesting severance pay and indicating her

intention to follow grievance procedures if she was unsatisfied with her "termination." The administrator responded in writing that same day. She expressed disappointment over Reetz's failure to apply for any available positions and advised that those positions had closed as of ten o'clock that day. The administrator also notified Reetz that her position would not be terminated until May 1 which fulfilled the thirty day notice of termination requirement. The administrator's letter concluded: "Arlie, you have been a very dedicated employee of Colonial Manor for the past 25 years. Your knowledge and experience will be missed. I am sorry you have chosen not to apply for one of the open positions."

[¶ 6.] On or about April 15, 1998, the human resources officer for the Black Hills Healthcare Network sent the following letter to Reetz:

Dear Arlie;

This afternoon I called you to discuss your request for severance pay and your employment status with Black Hills Healthcare Network. As we agreed. I am providing you with this written confirmation of our conversation.

Based on the fact that three positions were available and you were encouraged to apply for them at the time of the restructuring, we cannot offer you severance pay.

Deb Holm [i.e., the administrator] and Jean Witt want to retain you as an employee. *Consequently, we are offering you the Nurse Educator position without requiring you to complete the standard application process.* The position would be four days/32 hours a week. Jean Witt has agreed to let you choose your scheduled work days; for instance, Monday through Thursday or Tuesday through Friday. You would receive your current rate of pay, however, due to the compensation range for this position, you would be above the maximum pay rate. This would mean you would not receive increases to your rate of pay

unless the range changed significantly. You would still be eligible for lump sum payments based on performance.

I will be coming to visit with you at Colonial Manor on Wednesday, April 22 at 2:00 p.m., as we discussed today. At that time, you can let me know what you have decided.

You have been a very dedicated employee, Arlie. Your experience and knowledge makes you the best internal choice for the Nurse Educator position. It is my sincere hope that you accept this position. If you have any questions, please call me ... I will look forward to visiting with you again on April 22. (emphasis added).

[¶ 7.] Both the human resources officer and Reetz's immediate supervisor met with Reetz on April 22 and Reetz rejected the foregoing offer of employment. Her last day of work was on April 30, 1998. She subsequently filed a claim for unemployment insurance benefits that was denied on the basis that she voluntarily left her employment without good cause. An administrative appeal followed and a department of labor hearings officer conducted a hearing in August 1998. The hearings officer later entered findings of fact, conclusions of law and an order reversing the denial of benefits on the basis that Reetz did not quit without good cause and was not discharged for misconduct. Lutheran Health Systems appealed the department's decision to the circuit court which adopted the hearing officer's findings and conclusions and affirmed the allowance of benefits. Lutheran Health now appeals to this Court.

## ISSUE

[¶ 8.] **Did the circuit court err in affirming the Department of Labor's award of unemployment insurance benefits to Reetz?**

[¶ 9.] The unemployment insurance law disqualifies individuals from receiving benefits if they: voluntarily quit employment without good cause; are discharged for work connected misconduct; or fail, without good cause, to accept suitable work when offered. *See* SDCL 61–6–13; SDCL 61–6–14; 61–6–15. Lutheran Health argues that Reetz quit without good cause or failed to accept suitable work when offered and, therefore, the circuit court erred in affirming the department's decision to award her benefits.

We review administrative decisions in the same manner as the circuit court. Factual findings can be overturned only if we find them to be "clearly erroneous" after considering all the evidence. Unless we are left with a definite and firm conviction a mistake has been made, the findings must stand. The question is not whether there is substantial evidence contrary to the findings, but whether there is substantial evidence to support them. Conclusions of law are fully reviewable, as are mixed questions of fact and law that require the application of a legal standard.

*Abild v. Gateway 2000, Inc.,* 1996 SD 50, ¶ 6, 547 N.W.2d 556, 558–59 (citations omitted).

[¶ 10.] Neither of Lutheran Health's arguments are predicated on an entirely accurate assessment of the nature of Reetz's separation from her employment. This Court has not previously addressed a case where a person was notified of his impending discharge, was offered a different position by the same employer and then refused the offer of continued employment. Thus, it has never resolved whether this constitutes voluntarily quitting employment or refusing to accept suitable work when offered. Other courts have, however, addressed this issue. In *Department of Educ. v. Atwater,* 417 So.2d 749 (Fla. Dist.Ct.App.1982), the claimant was aware her part-time job would soon be terminated and refused the employer's offer of other suitable work. Because the work offer was extended while the claimant was still on the employer's payroll, the administrative agency concluded the refusal of the work offer did not constitute a disqual-

ification under Florida's "refusal of suitable work" provision. The Florida Court of Appeals disagreed observing: "it nonetheless becomes illogical if not outright ludicrous to require an employer first to discharge an employee whose termination is known by the employee to be imminent, before offering the employee other suitable work, in order for the offer and refusal to trigger the disqualification provisions of the statute." *Id.* at 751.

[¶ 11.] In *Graves v. Director of Div. of Employment Sec.*, 384 Mass. 766, 429 N.E.2d 705 (1981), a somewhat similar case, a factory worker was laid off for lack of work. The next month he received a certified letter instructing him to call his employer. The next day, the employer sent the claimant a notice recalling him to work. The employee did not call his employer or report back to work. In considering whether the recall offer was an offer of suitable employment, the Massachusetts court noted: "[w]hen a claimant loses his regular job because of a reduction in available work and refuses a job from the same employer, eligibility for unemployment benefits depends on whether the employee has refused an offer of suitable employment." *Id.* at 706.

[¶ 12.] These authorities make clear that Reetz's separation from employment is most appropriately reviewed as a refusal of suitable work pursuant to SDCL 61–6–15. While Reetz contends she was never formally "offered" work, only the opportunity to apply, that contention is rebutted by the letter from Reetz's superiors dated April 15, 1998 which plainly stated: "we are *offering* you the Nurse Educator position without requiring you to complete the standard application process."[3] (emphasis added). Thus, further analysis of this case turns on the question

of whether or not Reetz had "good cause" for refusing to accept Lutheran Health's offer of continued employment. *See* SDCL 61–6–15 (unemployed individual failing, "without good cause," to accept suitable work when offered disqualified from receiving benefits).

[¶ 13.] The standards implemented by various courts for determining the existence of "good cause" for refusing work are fairly uniform. In *Eck v. Unemployment Comp. Bd. of Review*, 651 A.2d 689 (Pa.Commw.Ct.1994), the Pennsylvania Commonwealth Court held: "[t]he burden is on the claimant to show that the work available was not suitable and he had a good cause for the refusal. To constitute good cause, real and substantial reasons must be offered for refusing suitable work." *Id.* at 692. Similarly, in *Murphy v. Employment Sec. Dept. of State*, 47 Wash.App. 252, 734 P.2d 924 (Wash.Ct. App.1987), the Washington Court of Appeals observed the purpose of the unemployment security act is to combat involuntary unemployment by providing benefits to persons unemployed through no fault of their own. The court went on to hold:

> To establish good cause for becoming voluntarily unemployed, a claimant must demonstrate (1) he or she left work primarily because of a work-connected factor of such a compelling nature that a reasonably prudent person would have left his or her employment, and (2) he or she first exhausted all reasonable alternatives prior to termination.

> \* \* \*

> Whether a work-connected factor of such a compelling nature would cause a reasonably prudent person to leave his

---

3. Absent the April 15 letter, Reetz's argument that she was never "offered" employment might hold merit. Lutheran Health's original distribution of job applications to her and announcement of available positions did not constitute "offers" of employment for purposes of the "refusal of suitable work" disqualification. *See Philadelphia Newspapers v. Com. Unemployment*, 57 Pa.Commw. 639, 426 A.2d 1289, 1290 (Pa.Commw.Ct.1981)(posted job openings were not offers of employment because they created no power of acceptance in the claimant or any other employee).

or her employment ... is determined by the particular facts in each case.

*Id.* at 926.

[¶ 14.] The reasonableness standard for determining the existence of good cause for refusing work was echoed by the Pennsylvania Commonwealth Court in *Gettig Engineering v. Com., Unemp. Comp. Bd.,* 81 Pa.Commw. 416, 473 A.2d 749, 752 (Pa. Commw.Ct.1984):

> In resolving the issue of whether Claimant had good cause to refuse work, the Claimant must prove that she acted reasonably and in good faith and that she had substantial reasons for refusing the employment. Moreover, the party who prevailed below, here the Claimant, is entitled to any favorable inferences which can logically and reasonably be drawn from the evidence. The issues of job suitability and good cause are ones of law and subject to our review. (citations omitted).

[¶ 15.] Applying these standards, Reetz has failed to establish good cause for refusing continued employment with Colonial Manor. Not only did she fail to show that the continued employment would not be suitable, she never asserted the employment was not suitable. Moreover, Colonial Manor made every effort to accommodate Reetz in terms of wages, hours and an acceptable schedule and Reetz still refused the employment. This calls into question the reasonableness of her actions.[4]

[¶ 16.] There is little support for Reetz's position that the e-mail comments of her superiors, comments she was not even intended to see, constituted sufficient maltreatment to be considered good cause for her refusal of continued employment. A good summary of cases in this area appears in Caroll J. Miller, Annotation, *Unemployment Compensation: Harassment or Other Mistreatment by Co–Worker as "Good Cause" Justifying Abandonment of Employment,* 40 A.L.R.4th 304 (1985). While some of these cases are written in the context of good cause for voluntarily quitting employment instead of good cause for refusing employment, there is a nexus between these two standards. *See Eck, supra* (if claimant has a necessitous and compelling reason to leave employment he also has good cause not to return to work for the same employer). In any event, the cases range from mere verbal exchanges and sparring among coworkers to more serious and affirmative acts such as sexual harassment. *See* Miller Annotation, *supra* at 305. Cases in the former category clearly fail the test of good cause for refusing employment and Reetz's situation falls into that category.

[¶ 17.] In *Esselman v. Job Service of North Dakota,* 548 N.W.2d 400 (N.D.1996), the unemployment insurance claimant claimed her resignation was for good cause because she was treated unprofessionally and verbally attacked and intimidated by her coworkers and superiors during group meetings. These are claims very similar to those Reetz makes here. In holding that the claimant did not have good cause for leaving her employment, the North Dakota court stated:

> An employee does not have good cause attributable to an employer to quit a job merely because the employee experiences irreconcilable differences with coworkers or is frustrated or dissatisfied

4. The dissent incorrectly asserts our application of a reasonableness standard for determining good cause for refusing employment is the use of "the wrong standard of review and test to reach [a] desired result of reversal." There is no "desired result" here. The only result that this opinion sets forth is what is appropriate under the application of the law. In *Matter of Unemployment Appeal of Fickbohm,* 323 N.W.2d 133 (S.D.1982), we adopted the reasonableness standard for determining good cause for refusing employment based upon decisions from the same Pennsylvania court we cite above. *See Fickbohm,* 323 N.W.2d at 136 (we agree with the Pennsylvania courts that fulfillment of parental responsibilities and duties is a substantial and *reasonable* basis for refusing to accept a job). If there is anything that shows a desire to reach a result, it is the timeline used by the dissent to massage the facts and reach its desired result.

with working conditions. If, however, an employee is being harassed by co-workers, the employee may have good cause to quit if the employer has notice of the harassment but fails to take timely and appropriate measures to prevent it. . . .

Unlike the circumstances in the foregoing cases, [the claimant here] does not claim she was being taunted, teased, or harassed by coworkers. Her subjective feelings of being intimidated and verbally attacked occurred in very limited circumstances during group meetings held for the specific purpose of having candid discussions to resolve employee conflict. A fair summary of [the claimant's] testimony is that she suffered stress at work because she and her coworkers simply could not communicate or get along. They ultimately split into factions or cliques with unresolved conflict and anger among them.

*Id.* at 404 (citations omitted).

[¶ 18.] Much the same could be written here. Moreover, in reaching its conclusions, the North Dakota Court was also persuaded by the efforts of the claimant's superiors to rectify the situation and the fact that these efforts were rejected by the claimant. That is also true here. Numerous apologies were attempted by Reetz' superiors and she was repeatedly informed that she was a good and valued employee they wished to keep. Despite the apologies and compliments, Reetz chose to leave her employment.

[¶ 19.] Based upon the foregoing, it is clear that Reetz failed, without good cause, to accept suitable work when offered and should have been disqualified from receiving unemployment insurance benefits pursuant to SDCL 61-6-15. Accordingly, the circuit court erred in affirming the department's decision to award benefits.

[¶ 20.] Reversed.

[¶ 21.] MILLER, Chief Justice, and GILBERTSON, Justice, concur.

[¶ 22.] SABERS and KONENKAMP, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 23.] I dissent to the majority opinion's conclusion that Reetz should be denied unemployment benefits because she "failed to establish good cause for refusing continued employment with Colonial Manor." The Department of Labor (DOL) found that Reetz was not discharged for misconduct and that she had good cause to quit her job. The circuit court affirmed. We should also affirm.

[¶ 24.] When reviewing administrative appeals, the standard of review is governed by SDCL 1-26-37, which provides that we "shall give the same deference to the findings of fact, conclusions of law and final judgment of the circuit court as [we do to] other appeals from the circuit court." Factual findings are sustained unless we find them to be clearly erroneous. Conclusions of law, however, are reviewed de novo. *Wernke v. State Dep't of Social Services*, 1999 SD 32, ¶ 4, 590 N.W.2d 260, 262 (citation omitted).

[¶ 25.] **1. Reetz left her employment at Colonial Manor with good cause.**

[¶ 26.] The majority opinion reduces the cause of Reetz' departure from LHS to "mere verbal exchanges and sparring among coworkers" and cites to Caroll J. Miller, Annotation, *Unemployment Compensation: Harassment or Other Mistreatment by Co-Worker as "Good Cause" Justifying Abandonment of Employment*, 40 A.L.R.4th 304 (1985) as support. I disagree with this characterization because it is incorrect and trivializes the facts and the reality of this workplace. I also disagree with the majority opinion's reliance on the above-cited A.L.R. because it limits its scope to problems between co-workers and does not apply to situations like this where Reetz was mistreated by her employer, not merely her co-workers. That simple fact distinguishes the cases the majority opinion relies upon as taken from that A.L.R.

[¶ 27.] Here, Reetz endured mistreatment by the administrative staff of LHS, a staff that had the ability to hire, fire and restructure the organization. In other words, Reetz was mistreated by her employer, not merely her co-workers. *See* James O. Pearson, Annotation, *Unemployment Compensation: Harassment or Other Mistreatment by Employer or Supervisor as "Good Cause" Justifying Abandonment of Employment,* 76 A.L.R.3d 1089 (1977).

[¶ 28.] SDCL 61–6–13 provides that "[a]n unemployed individual who, voluntarily without good cause, left h[er] most recent employment ... is denied benefits[.]" SDCL 61–6–13.1 provides five acceptable situations where "good cause" is established. The only reason potentially applicable here is the third situation, which requires Reetz to prove that "[t]he employer's conduct demonstrate[d] a substantial disregard of the standards of behavior that the employee has a right to expect of h[er] employer or the employer has breached or substantially altered the contract for employment[.]" Here, Reetz proved it. The DOL found it as a fact. The circuit court affirmed on those facts and now the majority opinion uses the wrong standard of review to reach its desired result of reversal.

[¶ 29.] The substance of the e-mail Reetz read on March 19, 1998 is crucial. The subject line of the e-mail read "Suck-up letter – Reply." The e-mail revealed a concerted effort between administrative employees to avoid using any language in a letter to Reetz that could be interpreted as a "guarantee of a position." The sender, a LHS administrative employee, recognized that Reetz may go to "grievance" and reviewed the proposed letter to Reetz in an effort to "help [Holm] cover [her] butt so that we know that everything is kosher over there and never give [Reetz] that loop hole." After reading this e-mail, Reetz was justified in believing that LHS was trying to get rid of her and any application she would submit for the other positions would be summarily rejected or received with bias or prejudice.

[¶ 30.] The time line here is also crucial:

03/15/98 Reetz was told that her job would be eliminated on April 1, 1998.

— She was also told that she could *apply for* other positions and was handed two job descriptions. She expressed that she would not consider a third job, the Nurse Educator position.

— She was also given the option of "wait[ing] until the dust settl[ed]' and take what is left over on the floor."

03/16/98 —Reetz discussed the resident assessment position with Jean Witt, the Director of Nurses. Witt informed Reetz that she better apply if she wanted because her position would be terminated April 1, 1998.

03/18/98 —Reetz filled out an application for one of the available positions.

03/19/98 —Before turning in her application, however, Reetz found the e-mail with the subject line reading "Suck up letter – Reply."

— . Reetz did not turn her application in because she felt, after reading the e-mail, that LHS was trying to get rid of her.

— Reetz wrote a letter to the administrative staff requesting severance pay for failure to provide (1) a job offer when she was initially terminated and (2) adequate notice of termination, as required by the LHS handbook.

— The administrative staff, by Holm, responded in writing the same day. Holm informed Reetz that the available positions closed 3/19/98 at 10:00 a.m. The letter also extended her termination date to May 1, 1998 (thereby avoiding the payment of severance pay).

04/15/98 —LHS wrote a letter to Reetz denying her request for severance pay. LHS then offered her the Nurse Educator position without requiring her to complete the "standard application pro-

cess." Interestingly enough, Reetz refused to consider applying for this job on March 15 "because of the stress and harassment to employees and because [she] has done staff education before." 04/22/98 —Reetz declined to accept the Nurse Educator position and "resigned."

[¶ 31.] Once this time line is considered, one must pause to consider whether Reetz was terminated or whether she voluntarily left. However, the time line reveals that it is obvious that Reetz had good cause to terminate her job with LHS. Reetz was terminated from her position on March 15, 1998 – this is indicated by her being allowed to "apply for" other positions. "Applying for" is substantially different from being "offered" a different position within the company. Thus, Reetz was informed, on March 15, of her termination, effective April 1. But Reetz did not surrender quietly.

[¶ 32.] According to the Luthern Health Services employee handbook, employees are informed that "[e]limination of a job is not considered termination if the employee is offered another position." The handbook also informs employees that they will be given thirty-days notice before termination of their position due to restructuring. Based on these policies, Reetz requested severance pay. LHS responded that same day and extended the effective date of her termination to May 1, 1998 to obviously avoid having to pay her severance pay. This is a classic demonstration of an employer circumventing its policies for the company's benefit. It evidences a "substantial disregard of the standards of behavior that the employee has a right to expect[.]" SDCL 61–6–13.1(3). *See also Randolph v. New Mexico Employment Security. Dep't.,* 108 N.M. 441, 774 P.2d 435, 438 (1989) (determining that the employer's failure to provide paychecks to its employee on the designated payday established good cause for the employee to voluntarily quit employment.).

[¶ 33.] On review, the question is whether the findings of fact are clearly erroneous. Here, they are not. Therefore, the decisions of the DOL and circuit court that Reetz had good cause to leave her employment with Colonial Manor should be affirmed. Consequently, Reetz is entitled to receive unemployment compensation benefits.

[¶ 34.] **2. Reetz is not disqualified from receiving unemployment benefits.**

[¶ 35.] SDCL 61–6–15 provides:

If the [DOL] finds that an unemployed individual has failed, without good cause, either to apply for available suitable work when so directed by [DOL] or to accept suitable work when offered h[er], the claimant shall be denied benefits . . . .

[¶ 36.] The DOL determined that the intention of the e-mail, to "cover their butts," extended to the reason the job offer was made to Reetz on April 15. Based on the above time line, it is obvious that Reetz was not offered a job until after she requested severance pay. It was at that point that LHS apparently realized that they had to "cover their butts" again to protect themselves from an increase in their experience rating account. LHS cleverly offered Reetz the same job that she declined to accept on March 15. In other words, LHS knew that Reetz would not accept the job they offered to her because she had previously turned it down once.

[¶ 37.] Additionally, the Nurse Educator position was a lower job classification than the Medicare plan coordinator position. Accordingly, there was a vast difference in the responsibilities between the two positions. "A discharged employee is entitled to a reasonable period of time to find work with a commensurate wage and benefits to h[er] previous job, before being required to accept lesser employment." *Johnson v. Virginia Employment Comm'n,* 8 Va.App. 441, 382 S.E.2d 476, 480 (1989).

[¶ 38.] Given the facts that (1) LHS offered Reetz a position they knew she was

not interested in and (2) the lapse of time between her discharge from her Medicare plan coordinator position and the offer of the Nurse Educator position was minimal, no "bona fide" job offer was ever made and Reetz is not disqualified from receiving unemployment benefits. To conclude otherwise is to reward an employer for engaging in "damage control" after the fact. We should have no part of that.

[¶ 39.] Even if the job offer were legitimate, Reetz had "good cause" for declining the job. The majority opinion incorrectly implies that we adopt a narrow test to determine "good cause," citing *Murphy v. Employment Security Dep't. of State*, 47 Wash.App. 252, 734 P.2d 924, 926 (1987). However, this incorrect test was used in *Murphy* by the Washington Court of Appeals to determine whether "good cause" existed when an employee becomes voluntarily unemployed. Our statutes already provide the correct test for determining that issue and we are compelled to use it. *See* SDCL 61–6–13.1 and Issue 1, *supra.* Furthermore, the *Murphy* test is not the test that we use to determine "good cause" in declining suitable employment.

[¶ 40.] In establishing whether an employee has good cause for refusing suitable employment, we have stated:

> Good cause ... must be deduced from the facts of each case ... and may cover reasons which are extraneous to the employment and strictly personal to the claimant, provided, however, such personal reasons involve real and substantial circumstances which compel the decision to refuse suitable work and rest on 'good faith.' '[G]ood faith, as used in this context, includes positive conduct on the part of the claimant which is consistent with the genuine desire to work and be self-supporting.'

*Anderson v. Western Dakota Insurors*, 393 N.W.2d 87, 90 (S.D.1986) (quoting *Matter of Unemployment Appeal of Fickbohm*, 323 N.W.2d 133, 135 (S.D.1982) (other citations omitted)). Once again, the majority opinion uses the wrong standard of review

and test to reach its desired result of reversal.

[¶ 41.] The circuit court found that Reetz "was desirous of being employed and self-supporting." This is not clearly erroneous as Reetz had every intention of applying for one of the two available positions before she found the "suck-up" e-mail. Therefore, Reetz demonstrated good faith. The same can not be said for LHS.

[¶ 42.] LHS had policies in existence in order to provide a sense of security to its employees and then violated those policies; for example, 30–days notice must be provided to all employees whose jobs will be eliminated due to restructuring. Only when Reetz challenged the actions of LHS and requested severance pay, did LHS extend the termination date to comply with this policy. Clearly, much more was involved here than "sparring" and "irreconcilable differences" between co-workers. This conduct evidences deception and a lack of good faith by LHS and we should not reward an employer for those qualities. Obviously, real and substantial circumstances existed which compelled Reetz to refuse the Nurse Educator position. Therefore, Reetz had good cause in refusing the position with LHS.

[¶ 43.] As the majority opinion points out, apologies were made to Reetz by the administrative staff, but Reetz was justified in thinking that those "apologies" were simply another effort to "cover their butt." Reetz can not be criticized for her justifiable suspicion that the apologies were submitted as part of the LHS "damage control" plan.

[¶ 44.] There is substantial evidence to support the decisions of the DOL and the circuit court and we should affirm the award of unemployment benefits.

[¶ 45.] KONENKAMP, Justice, joins this dissent.