2004 SD 29

**Valerie HABBEN, Claimant and Appellee,**

v.

**G.F. BUCHE CO., INC., Employer and Appellant.**

**No. 22965.**

Supreme Court of South Dakota.

Considered on Briefs Feb. 17, 2004.

Decided March 3, 2004.

John D. Jacobsen of Willoughby, Benson and Jacobsen, Burke, South Dakota, Attorneys for claimant and appellee.

Drew C. Johnson, Aberdeen, South Dakota, Attorney for appellee Dept. of Labor.

George F. Johnson of Johnson, Eklund, Nicholson & Peterson, Gregory, South Dakota, Attorneys for employer and appellant.

ZINTER, Justice.

[¶ 1.] Valerie Habben worked at a grocery store owned by G.F. Buche Co., Inc. (R.F. Buche, President; hereafter Buche or Employer). After a bank deposit was discovered missing, Habben was accused of taking the money and told that she had to admit the theft or she should leave. Habben did not return to work after the accusation. A hearing examiner and the circuit court awarded unemployment benefits, concluding that Habben did not voluntarily leave her employment without good cause. Absent any record evidence of Habben's guilt, we affirm.

### Facts and Procedural History

[¶ 2.] Habben started working for Employer as a grocery store checker in Sep-

tember 2001. On February 2, 2002, Buche informed all employees that a bank deposit was missing,[1] and he was eager to have the money returned. Buche told the employees that whoever took the money could keep their job if the money was anonymously returned to an outside mailbox at the post office the next morning.

[¶ 3.] The money was not returned, so Buche contacted Sergeant Zylstra of the Wagner police department. Buche told Zylstra that if an employee admitted taking the money and returned it, he or she would not lose their job. On February 4, 2002, Zylstra interviewed Habben and the other employees who had worked on February 1. Zylstra informed them of Buche's offer.

[¶ 4.] This offer was also communicated to an agent of the Division of Criminal Investigation (DCI), who assisted Zylstra in the investigation. The DCI agent and Zylstra conducted a second round of interviews on February 6, 2002. Buche was out of the office that day and did not participate. Habben was scheduled to work from 11 a.m. to 5 p.m. When she arrived, she was told that Zylstra and the DCI agent were interviewing employees. Habben met with Zylstra and the DCI agent that morning.

[¶ 5.] At the meeting, the DCI agent reiterated that if Habben admitted to taking the money, she could keep her job. Habben, however, denied the theft. Zylstra asked Habben if she would be willing to take a polygraph test, and she responded that she would if everyone else had to. The DCI agent then told Habben that he, Zylstra, and Employer's management believed that she had taken the money. The DCI agent told Habben that they believed she took the money because she was a single parent with five children, so "she

had the most to gain by taking it." The agent continued in his requests for an admission, and Habben continued to deny the theft. The DCI agent persisted, and in addition, made a number of statements as to what would happen if Habben did not admit. In one of those statements, he indicated that Habben's children would be taken away from her unless she admitted. Habben ultimately left the room and went to see the store manager. She told the manager that the process was "bull....." She then left work at about 11:45 a.m. without permission.

[¶ 6.] The next day, February 7, 2002, Habben did not report for work. Employer's office manager contacted Habben and asked her to come in to talk to Buche. Habben complied, and during the meeting Buche told her that he and the police believed that she was responsible. Buche also repeated that if she gave the money back, she could retain employment. Habben, however, continued to deny any involvement. Buche then told Habben that unless she made an admission by 3 p.m. that day, a grand jury would convene and issue an indictment against her. After further discussions, Habben asked Buche if she could leave. Buche responded: "If you walk out that door *without admitting it*, I don't ever want to see your face again." Habben testified that she left, believing she had been terminated.

[¶ 7.] Sometime thereafter, Habben filed claims for unemployment benefits. The South Dakota Unemployment Insurance Division determined that Habben voluntarily left her employment without good cause and was therefore disqualified from receiving benefits. A hearing examiner reversed, finding that Habben did not voluntarily quit, but was constructively fired. The circuit court adopted the hearing ex-

---

1.  $4,061.98 was missing.

aminer's findings. Employer now appeals to this Court raising the following issue:

Whether Habben was disqualified from receiving unemployment insurance benefits after her employment terminated.

### Analysis and Decision

[¶ 8.] Our standard of review is well established.

We review administrative decisions in the same manner as the circuit court. Factual findings can be overturned only if we find them to be "clearly erroneous" after considering all the evidence. SDCL 1–26–36; *Permann v. South Dakota Dept. of Labor*, 411 N.W.2d 113, 117 (S.D.1987). Unless we are left with a definite and firm conviction a mistake has been made, the findings must stand.... Conclusions of law are fully reviewable, as are mixed questions of fact and law that require the application of a legal standard. *Schuck v. John Morrell Co.*, 529 N.W.2d 894, 896 (S.D. 1995) (citations omitted).

*Abild v. Gateway* 2000, *Inc.*, 1996 SD 50, ¶ 6, 547 N.W.2d 556, 558–59. In conducting our review, we also consider that it is Employer's burden to prove that Habben was not eligible for benefits. *In re Johnson*, 337 N.W.2d 442, 446 (S.D.1983) (citations omitted).

[¶ 9.] Individuals are disqualified from receiving unemployment insurance benefits if they "voluntarily quit employment without good cause[.]" *Reetz v. Lutheran Health Sys.*, 2000 SD 74, ¶ 9, 611 N.W.2d 230, 233 (citing SDCL 61–6–13). Habben asserts that she did not voluntarily terminate, and that if she did, she is not disqualified from receiving benefits because she had good cause to leave her employment. Employer, however, argues that Habben simply "made the decision" not to come back to work, and therefore, she quit voluntarily and became ineligible for benefits.

[¶ 10.] In supporting its argument, Employer points out that Habben was not expressly fired. Employer indicates that: no one ever told Habben that she would be "fired" or "terminated" if she did not admit taking the money; that all employees were told that no one would lose their job; and that all questioned employees were given the same "offer" of continued employment if they returned the money.

[¶ 11.] However, there is also record evidence that Habben reasonably believed she had been terminated by Employer. First, the record reflects that Habben was repeatedly approached and told that she could keep her job *if* she admitted to the theft. Habben also stated that she was "really, really intimidated" by Zylstra and the DCI agent, and she felt "they had already discussed it, I was fired and out of there." Moreover, she was told that she would be indicted by a grand jury and her children would be taken away if she did not make an admission. Ultimately, Buche told Habben, "If you walk out that door without admitting it, I don't ever want to see your face again." Later, when Buche was asked about his plans for Habben if she did not admit taking the money, he conceded that he "was hoping that, ah, she would not show up[.]"

[¶ 12.] Considering this evidence, the hearing examiner found that "[Habben] did not report for work as scheduled on February 7, 2002, because she *reasonably believed* her employment was terminated because she refused to admit to taking the money." (Emphasis added.) The hearing examiner also concluded that she believed Habben's testimony. Under all of these circumstances, we conclude that the hearing examiner was not clearly erroneous in finding that Habben "reasonably believed

that her employment was terminated," and she did not voluntarily quit.

[¶ 13.] Employer, however, also argues that there was no "good cause" for Habben's termination. South Dakota law requires "good cause" for voluntarily terminations. The relevant portion of the statute provides:

"Good cause" for voluntarily leaving employment is restricted to leaving employment because:

. . .

(3) The employer's conduct demonstrates a substantial disregard of the standards of behavior that the employee has a right to expect of an employer or the employer has breached or substantially altered the contract for employment[.]

SDCL 61–6–13.1(3).

■■ [¶ 14.] We agree with Habben that, absent evidence of guilt, "[d]emanding that an employee admit to thievery in order to retain a job is certainly conduct which demonstrates a substantial disregard of the standards of behavior any employee has a right to expect." Additionally, we believe that under these circumstances, requiring an involuntary admission of theft as a condition of continued employment "substantially altered"

Habben's contract of employment. *Id.* Therefore, even if Habben had voluntarily quit, we agree that she had "good cause" under SDCL 61–6–13.1(3).

[¶ 15.] Employer, however, also argues that SDCL 61–6–13.1(3) is inapplicable because law enforcement, rather than Employer, engaged in the coercive conduct that gave Habben reason to believe she was terminated. Employer points out that SDCL 61–6–13.1(3) only applies to *employer* conduct, and that when Habben left work before the end of her shift on February 6, 2002, she left because of the conversations with the law enforcement officers. Therefore, Employer argues that "good cause" cannot be established under SDCL 61–6–13.1(3).[2]

[¶ 16.] We do not agree because factually, Zylstra, the DCI agent and Employer were all part of a "concerted effort." *Cf. Reetz,* 2000 SD 74, ¶ 29, 611 N.W.2d at 237 (Sabers, J., dissenting) (noting that a "concerted effort" of administrative employees in their communications with employee justified employee's belief that employer was "trying to get rid of her"). Here, there was a concerted effort to get Habben to confess. There is no dispute that Zylstra and the DCI agent were acting at Employer's request and for its benefit.

---

**2.** Employer specifically argues that:

(1) [The DCI agent] is obviously not [Habben's] employer, and as such, his conduct is not contemplated by SDCL 61–6–13.1.

(2) [Employer] had no employment or agency affiliation with [the DCI agent] or the DCI, and he had no authority to control how [the DCI agent] conducted his investigation.

(3) [The DCI agent] has never had any type of employment affiliation or agency agreement with [Employer]. Moreover, [Employer] did not expressly or impliedly give [the DCI agent] or Sergeant Zylstra the authority to fire his employees.

(4) Neither [Employer] nor his supervisors told [the DCI agent] how to conduct his

investigation, and they never told him to focus his investigation on any particular suspect.

(5) Given that SDCL 61–6–13.1(3) contemplates only the employer's conduct, the Court will note that [Employer] was not present at the store on the day [Habben] decided to walk off the job.

(6) Given that SDCL 61–6–13.1(3) contemplates only the employer's conduct, the Court will note that neither [Employer] nor his supervisors said anything to [Habben] that caused her to walk off the job. To be redundant, [Habben] admits that she walked off the job because of [the DCI agent's] conduct.

Indeed, the Hearing Examiner found that "since [the admit or terminate statement] is the same statement that the DCI agent made to [Habben] during the February 6 interview, the preponderance of the evidence indicates that [Employer] communicated this to Zylstra, who communicated it to the DCI agent, who then communicated it to [Habben]." Moreover, Habben was told that Zylstra, the DCI agent, *and Employer's management* believed that she took the money. Furthermore, everything Habben was told by law enforcement was in line with what all employees were told when Employer first discovered the missing deposit. Finally, even though we acknowledge that Habben initially left on February 6 because of law enforcement's conduct, her final separation from employment occurred after the February 7 accusation in which Buche himself told her to admit to the theft or leave. Therefore, in light of Buche's personal and collaborative efforts, we believe that his conduct was sufficiently related to Habben's separation to be deemed caused by employer conduct.

[¶ 17.] We conclude that, absent evidence of Habben's participation in the theft, the hearing examiner and the circuit court were justified in finding that Habben did not voluntarily quit without good cause.

[¶ 18.] Affirmed.

[¶ 19.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP and MEIERHENRY, Justices, concur.