**Monica QUICK v. DEPARTMENT OF LABOR (RDSD Enterprises, Inc., Employer)**

[992 A.2d 1028]

No. 09-006

¶ 1. December 3, 2009. Claimant appeals the Employment Security Board's decision denying her unemployment benefits for a specified period based on its conclusion that she quit her job voluntarily without good cause attributable to her employer. We affirm.

¶ 2. Claimant had been working as a night clerk at a convenience store for about two years when, on the evening of July 12, 2008, she told her supervisor that she had injured her back. The supervisor allowed her to go to the hospital emergency room, where she was treated and told she could return to work, which she did. Approximately one month after the incident, claimant received a bill from the hospital for her emergency room visit. Upon calling the hospital, she learned that her employer had refused to pay the bill. Claimant complained to her supervisor, who told her to speak to the store owner. She met with the store owner on the morning of August 15, 2008. The owner told claimant that she had heard two other versions, one from a co-worker and one from a supervisor, and both attributable to claimant, of how claimant had hurt her back before coming to work. Thus, she was skeptical of claimant's contention that she had injured her back at work while reaching for items on a shelf. The owner further stated that she would try to arrange for claimant to take a state police polygraph test. Claimant then turned in her key and left her job.

¶ 3. Claimant filed a claim for unemployment benefits on August 25, 2008. A claims adjudicator found that claimant had left her job voluntarily without good cause attributable to her employer, and thus was disqualified from receiving benefits at that time. See 21 V.S.A. § 1344(a)(2)(A) (stating that claimant is disqualified from receiving benefits for given period if claimant left job voluntarily without good cause attributable to employer). Claimant appealed from the denial of benefits, and following a telephonic hearing, an appeals referee upheld the claims adjudicator's ruling. The referee concluded that claimant quit after becoming offended by having her truthfulness questioned, but that employer's doubts about claimant's credibility were not so insulting or demeaning as to cause a reasonable person to leave her job. The referee noted, also, that claimant's advocate at the hearing argued that a polygraph would have been illegal and so automatically gave claimant good cause to quit. According to the referee, however, there was no immediate threat of actually requiring claimant to take a polygraph test sufficient to justify her quitting. Claimant appealed that decision to the Board.

¶ 4. The Board adopted the referee's findings of fact, but added that employer mandated polygraphs are prohibited by law, see 21 V.S.A. § 494a(a)(1) (stating that employer shall not, as express or implied condition of receiving benefit of employment, "request or require that an employee . . . take or submit to a polygraph examination"), and further opined that employer failed to obey the workers' compensation law requiring a timely first report of injury, whether credible or not. See 21 V.S.A. § 701 (requiring employers to report, within seventy-two hours, any work-related injuries necessitating medical attendance). Nevertheless, the Board also adopted the referee's conclusion that the "employer's apparent disregard or ignorance of the law was *not* the actual catalyst for the claimant's resignation."

(Emphasis added.) The Board agreed that claimant had voluntarily quit her job, without good cause attributable to her employer, when confronted by her employer with conflicting accounts of how she had been injured.

¶ 5. On appeal, claimant argues that employer's violations of Vermont's workers' compensation law and arguable violation of the state's prohibition against employer polygraphs provided per se good cause for her to quit her job. In support of this proposition, she relies upon *Burke v. Department of Employment Security*, 141 Vt. 582, 587, 450 A.2d 1156, 1158 (1982), where this Court overturned the Board's decision and held that "[t]he employer's breach of its contractual obligation to provide medical coverage provided good cause, attributable to the employer, for the claimant to quit." We decline to adopt claimant's proposed per se rule, because such a rule is inapposite to the facts of this case. First, assuming the polygraph was a sufficiently real threat, it was not the reason for claimant's leaving. Second, despite employer's failure to duly report the injury, that omission was similarly not the reason for claimant's leaving. The Board found, as claimant and employer testified, and claimant explained in her application for benefits, that she left because of the perceived insult of being called a liar by her employer.[1] The Board concluded that, given the differing versions of the cause of the injury, the circumstance of employer challenging claimant's credibility did not compel an involuntary resignation warranting unemployment compensation. The findings of fact are supported by the

evidence, and the conclusions are supported by the facts. Neither compel, as a matter of law, a different result than that reached by the Board. See *id.* at 584, 450 A.2d at 1157 (stating that issue of whether resignation was for good cause attributable to employer is matter within special expertise of Board and thus entitled to great weight on appeal).

¶ 6. In *Burke*, in contrast to this case, the employee quit after discovering that his employer had breached a contractual promise to provide medical coverage. The Board concluded that the employee's resignation was premature and based on the mere anticipation that the employer had not reinstated the coverage as claimed. On appeal, this Court reversed the Board, noting that the employer's breach of its contractual obligation and its deliberate concealment of that fact indisputably called into question the reliability of the employer, who, as it turns out, had not reinstated the coverage. *Id.* at 586, 450 A.2d at 1158. We emphasized that the employee had agreed to perform certain duties for certain consideration, part of which was medical insurance, and that the employer had breached that promise by failing to provide the insurance, which had a distinct monetary value. *Id.* at 585, 450 A.2d at 1157. We noted that the Board's illogical reasoning would have allowed the employee to quit during the three-month period of lapsed coverage, but required him to stay on the job based on the employer's claim of reinstated coverage simply because the employer had successfully concealed the lapsed coverage from the employee. *Id.*

¶ 7. The situation here is quite different. Employer's failure to comply with the law did not deprive claimant of a contractually promised monetary benefit. Cf. *Allen v. Dep't of Employment Sec.*, 141 Vt. 132, 133-34, 444 A.2d 892, 893 (1982) (failure to provide promised training that would have led to better-paid position); *Seymour v. Dep't of Employ-*

---

[1] The dissent treats these circumstances as tantamount to a constructive firing when no such claim was raised below and the Board found, based on claimant's own description of events, that she quit for the reason given: that her boss was dubious about her injury claim.

*ment Sec.*, 137 Vt. 79, 80, 399 A.2d 519, 520 (1979) (per curiam) (failure to provide promised transportation to job site); *Zablow v. Dep't of Employment Sec.*, 137 Vt. 8, 9, 398 A.2d 305, 306 (1979) (per curiam) (failure to pay wages when due); *Shorey v. Dep't of Employment Sec.*, 135 Vt. 414, 415, 377 A.2d 1389, 1390 (1977) (per curiam) (failure to pay promised raise). Employee herself filed a first report of injury shortly after she quit, and she did not suffer any tangible detriment from employer's failure to file the report earlier. Despite the dissent's concern to the contrary, there was no evidence that claimant faced having to forego her workers' compensation claim which, of course, she was free to pursue regardless of employer's cooperation. Nor did employer's threat of having claimant take a polygraph test directly result in a loss of a tangible benefit.[2] Employer further testified that claimant did not say she would refuse the test but rather that she abruptly left, saying that she did not appreciate being called a liar. No evidence suggested she would have been fired for refusing a polygraph, as feared by the dissent, had employer ever figured out how to get the state police to administer one.

¶ 8. Claimant testified before the administrative law judge that she felt like she was being treated disrespectfully and that she "just assumed" that she would have been fired if she had refused to take a polygraph test. Based on this testimony, the referee and the Board found that claimant prematurely quit because she was offended by employer's suggestion

---

[2] Claimant maintains that the perceived threat of employer's polygraph interfered with her workers' compensation claim, but the record reflects that claimant filed a claim based on her own report of injury regardless of the fact that employer expressed interest in having her attend a polygraph examination.

that she was lying about the circumstances surrounding her injury, not because she felt threatened that she would be fired if she refused to take a polygraph test. Given this record and our deference to the Board in these matters, we decline to overturn the Board's determination that claimant did not act reasonably in quitting and that she failed to meet her burden of demonstrating that she quit for good cause attributable to her employer. See *Skudlarek v. Dep't of Employment & Training*, 160 Vt. 277, 280, 627 A.2d 340, 342 (1993) (stating that good cause is determined in each case according to reasonableness standard, and that claimant bears burden of proving good cause). In support of its position that the Board's decision should be overturned, the dissent essentially wars with the referee's and the Board's factual findings concerning the reason claimant left her employ; however, the record, viewed most favorably to the prevailing party, plainly supports those findings.

¶ 9. Claimant also argues that the appeals referee committed reversible error by refusing to admit evidence of her medical records. We find no abuse of discretion. Evidentiary hearings before an appeals referee are not bound by the rules of evidence, 21 V.S.A. § 1351, and under Board rules parties may present such evidence as may be pertinent. The sole issue before the referee was whether claimant left her job for good cause attributable to her employer. Whether claimant had injured herself or received treatment was not relevant to that issue. Nor was how claimant was injured or whether she was telling the truth about her injury directly at issue; but even if they were, the medical records could not have confirmed the origin of the claimed injury.

*Affirmed.*

¶ 10. **Johnson, J.,** dissenting. How is it that an employee whose employer never

filed a first report of injury, in violation of workers' compensation laws, and whose employer threatened the employee with an illegal polygraph because the employer doubted the employee's credibility, is not entitled to leave her job for good cause? In upholding the Board's decision in this case, the majority opinion denies to this employee the protection of yet another Vermont law enacted for the protection of workers — the unemployment compensation system — a law that is to be liberally construed.

¶ 11. The purpose of allowing a worker who leaves her job voluntarily for "good cause" to access unemployment benefits is obvious — the employee will not be forced to endure an oppressive work situation for fear that abandoning that situation will leave the employee without the essential economic safety net provided by unemployment benefits. At the heart of this and other worker protection laws is the recognition that the power dynamic between employer and employee is one that tilts heavily in favor of an employer. Ignoring the worker protection laws, the majority opts instead to leave an employee with the Hobson's choice of voluntarily exiting a toxic work environment, thereby forfeiting unemployment benefits, or enduring that toxic work environment until the employer fires her. Because I believe claimant had good cause to leave her employment, I cannot agree with the Board's conclusion that she did not act reasonably in quitting. I, therefore, respectfully dissent.

¶ 12. Claimant worked for approximately two years for employer as a convenience store night clerk, making an hourly wage of $8.25. On July 12, 2008, claimant told her supervisor that she had injured her back the night before while reaching for something on a shelf. She then went to the emergency room for treatment. When claimant received the bill for her medical expenses, she approached employer to ascertain why her bill was not paid through workers' compensation. At this meeting, employer indicated that she did not believe claimant's version of the events precipitating the need for medical treatment and threatened to call the state police to arrange for claimant to take a lie-detector test. Claimant subsequently left her employment and filed an application for unemployment benefits, the denial of which is the subject of this appeal.

¶ 13. Despite its "troubling" findings that employer had violated two worker protection laws — 21 V.S.A. § 494a, which makes it illegal for an employer to require an employee to submit to a lie-detector test as a condition of employment, and 21 V.S.A. § 701, which requires an employer to file a report of injury for purposes of workers' compensation — the Board nonetheless concluded that in this case "the employer's apparent disregard or ignorance of the law was not the actual catalyst for the claimant's resignation." Instead, the Board concluded that claimant, "when confronted by the employer with conflicting accounts of how she had injured herself, chose to voluntarily resign." Claimant argues that the Board erred as a matter of law in upholding the denial of claimant's unemployment benefits and disregarding the import of employer's violation of these two worker protection laws. I agree. Even under the deferential standard of review owed to the Board's conclusions, the established facts in this case — specifically the acknowledgment that employer violated two worker protection laws — simply do not support the result reached by the Board and, therefore, "compel a different result as a matter of law." *Burke v. Dep't of Employment Sec.*, 141 Vt. 582, 584, 450 A.2d 1156, 1157 (1982) (quotation omitted).[3]

---

[3] Though the majority accuses me of warring with the referee's and Board's factual findings, *ante*, ¶ 8, I reiterate that I

¶ 14. The position of the Department of Labor, which was set forth by the hearing officer and adopted by the Board, was that employer's mere threat of an illegal polygraph test was of no moment: "Had a refusal by the claimant to undergo such a test led to her discharge by the employer, such a discharge would undoubtedly be considered as not for misconduct. But the mere threat of arranging such a test does not provide good cause attributable to the employer for initiating separation." This is a proposition we explicitly rejected in *Burke*, where we concluded that an employee had good cause to leave his employment after an employer breached his contractual obligation to provide health care benefits even though "the employer might make it up tomorrow." *Id.* at 587, 450 A.2d at 1158.

¶ 15. The majority sees a distinction between this case and *Burke*, because the violation "did not deprive claimant of a contractually promised monetary benefit." *Ante*, ¶ 7. But the protections afforded by state laws are just as much a part of the contract of every worker in the state as any private obligation to pay medical benefits. Indeed, they are stronger than private obligations because they have the force of the Legislature's public policy behind them. Just as breach of an employer's contractual obligations to her employees may give an employee good cause to quit, so too must a breach of employer's legal obligations to her employees. See *Hodgeman v. Jard Co.*, 157 Vt. 461, 464, 599 A.2d 1371, 1373 (1991) (noting that "workers' compensation statute is remedial and is to be construed broadly to further its purpose of making employees injured on the job whole"); see

accept the findings of fact regarding the events leading up to this action, but disagree with the legal conclusion the referee and Board drew from those findings — that these events did not amount to good cause for claimant to quit.

also *Garrelts v. Employment Div.*, 535 P.2d 115, 117 (Or. Ct. App. 1975) (concluding that claimant who proved he quit his job because employer would not make legally required deductions from his pay established good cause for leaving); *Zinman v. Unemployment Comp. Bd. of Review*, 305 A.2d 380, 381 (Pa. Commw. Ct. 1973) (concluding that where employer illegally recorded telephone calls in course of business, even though claimant was not required to record calls himself, he still had good cause to leave where "[t]he practice was at best highly questionable and the avoidance . . . seems to us to have been the path to prudence"). The benefit to an employee of an employer's adherence to state laws is obvious and avoids the exact situation in which claimant found herself: saddled with an expensive medical bill and facing resistance from her employer in accessing her rights under the law.

¶ 16. Moreover, the Board's conclusion that these two violations were not the actual catalyst for claimant leaving does not follow from the undisputed evidence. Claimant confronted employer for the sole reason that her $1208 hospital bill had not been paid by workers' compensation. At this meeting with employer, claimant was immediately (and illegally) threatened with a lie-detector test. This situation amounts to more than what the majority characterizes as merely a "perceived insult of being called a liar by her employer." *Ante*, ¶ 5. It signals the effective end of the employment relationship. See *Habben v. G.F. Buche Co.*, 2004 SD 29, ¶ 14, 677 N.W.2d 227 (requiring admission of theft as condition of continued employment amounted to good cause to quit); *In re May*, 609 N.Y.S.2d 444, 444 (App. Div. 1994) (mem.) (concluding that claimant left for good cause where employer refused to investigate claimant's claim of innocence after he was accused of stealing and was told he would be carefully watched in future). The Board just

refused to see it and trivialized claimant's response as an insult to her credibility that was not "sufficiently demeaning."

¶ 17. Here, claimant did exactly what I would have thought the Board considered appropriate. She made a good faith effort to amicably settle the dispute with her employer over the cause of her injury. Oddly, the majority and the Board conclude that claimant left merely because she took offense to her credibility being placed into question. This conclusion seems to imply that claimant would have been better off quitting immediately after she became aware that there was a problem with the processing of her workers' compensation claim. Instead, claimant approached employer and tried to salvage the work relationship. Seeing that peaceful resolution "was going absolutely nowhere" and faced with illegal threats of being subjected to a lie-detector test combined with employer's illegal refusal to submit a report of the injury, claimant took the only recourse she felt she had: she left what had become the same sort of "intolerable situation" we found amounted to good cause to quit in *Burke*.

¶ 18. If it is not good cause to leave an employment relationship that has broken down because the employer refuses to follow the law, then a worker will be forced to suffer the consequences of the illegality, which, in this case, would have meant foregoing a workers' compensation claim or waiting to be fired for refusing a polygraph. It is no consolation to the worker to have been fired unfairly — it is still a firing. The worker still has the burden of applying for a new job and explaining the unfair firing. All a new employer will see is that this worker is accusing her former employer of illegality. It is hard enough to obtain employment in today's economy, but it will be almost impossible for a worker in the untenable situation the Board and the majority suggest should have happened in this case.

¶ 19. Finally, it is more than "troubling," if I may use the words of the Board, that one arm of the State of Vermont, the Department of Labor, viewed the workers' compensation law violation and the illegal threat of a polygraph as irrelevant to this employment relationship. Because I believe that claimant did have good cause to leave her employment, I would reverse the Board's denial of unemployment benefits.

¶ 20. I am authorized to say that Justice Dooley joins this dissent.

Motion for reargument denied January 6, 2010.